3 F.3d 705
 Mark WALDORF
v.
Edward J. SHUTA; Carolyn Wood; Kenneth C. Spence, Jr;
Mark Kay Spence; the Borough of Kenilworth, A Municipal
Corporation of the State of New Jersey; Joseph Rego; Henry
J. Moll; Victor Smith; Lawrence Stickle; Charles David;
Joseph Ventre; Thomas Neville; William J. Ahern; William
E. Conrad; Livio Mancino; Gary Rowinsky; Mario Dibella;
Vincent Scorese; Harry Grapenthin; Mary Kelly; Richard
McCormack; William Holt; A. Zeleniak; Richard Lomax; C.
William Gutekunst; Frederick Bailey; Michael Padula;
Charles Scheuerman; Fred Sues; Joseph Walyuf; Thomas
McHale; Philip Ernst; Frank J. Mascaro; Walter E.
Boricht, Jr.; Albert Simmenroth; James E. O'Brien; Frank
J. Johdof; Michael Bury; Peter S. Patuto; Raymond
Blydenburgh; Edward Kasbarian; John J. O'Lock; Edmac
Enterprises; Edward McDermott
Borough of Kenilworth, Appellant.
 No. 92-5699.
 United States Court of Appeals,
Third Circuit.
 Argued July 20, 1993.
Decided Sept. 1, 1993.
 
 Susan M. Sharko, Raymond M. Tierney, Jr., (argued), Kenneth J. Wilbur, Shanley & Fisher, P.C., Morristown, NY, for appellant.
 Randall J. Richards, Warren W. Wilentz (argued), Michael J. Barrett, Wilentz, Goldman & Spitzer, Woodbridge, NJ, for appellee.
 Before: MANSMANN, GREENBERG and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 In this appeal we are asked to decide whether the district court erred in denying defendants' motions for a mistrial based on the jury's inadvertent exposure to media coverage of a $30 million verdict awarded in a similar case. The defendant, the Borough of Kenilworth, argues that the jurors' knowledge of the exact damage award in that case, involving similar injuries as in this one, provided the jury with a prejudicially impermissible yardstick by which to measure the plaintiff's claim for damages. Because the trial court did not conduct an adequate voir dire, and because we cannot know what the jurors' responses would have been to a searching inquiry based on objective criteria, we will vacate the judgment entered on the jury verdict and remand for a new trial.
 
 I.
 
 2
 Mark Waldorf was rendered a C6-C7 level quadriplegic as a result of a motor vehicle accident which occurred in the Borough of Kenilworth on November 17, 1982. On September 21, 1984, Waldorf filed a federal court action seeking damages against the drivers of the vehicles involved, the Borough and various Borough officials. The district court had diversity jurisdiction pursuant to 28 U.S.C. Sec. 1332(a). The first trial of the case resulted in a jury verdict for Waldorf, against the Borough and other defendants, in the amount of $8.4 million. On appeal to us, we reversed and remanded for a new trial, Waldorf v. Shuta, 896 F.2d 723 (3d Cir.1990).
 
 
 3
 On remand, the trial was bifurcated on the issues of liability and damages. The parties agreed to try the issue of damages first; following the trial on damages, the Borough stipulated to liability. At the trial's outset, the district court carefully and explicitly instructed the jury to avoid news stories concerning other accidents. Specifically, the jury was to:
 
 
 4
 [t]ry to avoid reading newspaper articles that maybe involve accidents. And, in particular, has anyone read the Newark Star-Ledger today? (No response.) All right. In particular there's an article there that speaks about a specific type of injury. I ask that you avoid reading that article and the reason that I ask you to do that is because you're going to decide this case based upon the testimony that's going to be presented in this case and not by any statement made by some other extraneous source....
 
 
 5
 (A. 88).
 
 
 6
 On September 24, 1992, the last day of trial, the Borough moved for a mistrial due to the jury's exposure to a potentially prejudicial news report. At the conclusion of trial, on the evening before closing arguments were to be made to the jury, during its eleven o'clock news program, WNBC reported that a jury, that day, had awarded $30 million to a New York City high school student from Queens, New York, who was rendered a quadriplegic as a result of a shooting which occurred at school. The WNBC television news coverage of the verdict included excerpts from a video, "a day in the life" of Stanley Pacheco. The video showed Mr. Pacheco performing routine daily tasks--being dressed by attendants, being fed cereal by another attendant, while a television reporter, in the background, stated that Mr. Pacheco was paralyzed from the neck down. The $30 million award to Pacheco was described by the WNBC reporter as a "fortune." On the next morning, September 25, 1992, immediately prior to closing arguments, counsel for the Borough brought this situation to the court's attention.
 
 
 7
 The district court then questioned the jury as a group in the jury room in order to determine which members of the jury had been exposed to the news coverage of the Queens verdict. The district court asked the jurors the following question en banc: "Did anybody see TV coverage last night where there was a discussion of a case in New York City?" (A. 174-175). Two of the jurors, Jurors Ray Thomson and Tanksley, indicated that they had seen the television news report.
 
 
 8
 Juror Noweck indicated that he had inadvertently read about the Queens case in the newspaper.[1] On the morning of September 25, 1992, the day the jury ultimately reached its verdict, the New York Post devoted one paragraph to coverage of the same story. The New York Post account of the verdict reported, "In a precedent-setting verdict, a Queens jury ordered the Board of Education to pay close to $30 million in damages." (A. 63).[2] Another juror, Jim Cosmis, indicated he, too, had read about the case in the morning newspaper.
 
 
 9
 Significantly, these media reports of the Queens verdict placed before the jury the very same type of information the district court had excluded as inadmissible. At trial, the Borough sought to call, as witnesses, three quadriplegics with functional capabilities similar or comparable to Plaintiff Waldorf's capabilities. The district court ruled that the evidence relating to other quadriplegics was inadmissible.
 
 
 10
 When asked if the Queens case had been discussed among the jurors, Juror Susan Kelly replied, "Not really." (A. 176). At this point, the district court decided to examine individually, in chambers, each juror who had indicated knowledge of the Queens verdict.
 
 
 11
 Juror Number One, Susan Kelly, called into chambers first, was asked what knowledge she possessed of the Queens case. Juror Kelly responded that "There was a little blurb about a student who had been paralyzed and an award was given for a certain dollar amount." She stated that she believed the dollar amount that had been awarded was $30 million. (A. 178). The district court questioned whether, if she continued to serve as a juror on the case, she could disregard the Queens verdict. Juror Kelly replied, "Yeah ... because it was a different circumstance." (A. 178).
 
 
 12
 Mr. Noweck, Juror Number Six, was called next and asked what, if anything, he knew. Mr. Noweck replied that a "Teenager was shot, quadriplegic and received a settlement." Mr. Noweck stated that he believed the amount of money was $30 million. The district court asked Mr. Noweck the source of his information. Mr. Noweck answered that his source was the New York Post. Mr. Noweck assured the court that if he continued to serve on the jury he could set aside the Queens case and decide Waldorf's case fairly and impartially based upon the evidence presented. (A. 179). The district court asked Mr. Noweck if he had discussed the Queens verdict with any of the other jurors. He replied, "No." (A. 180).
 
 
 13
 Mr. Tanksley, Juror Number Four, was then questioned. He indicated that he was aware of a high school student who was shot who received $30 million as compensation that had been granted by a jury. (A. 180). He learned this information first from television and subsequently, he read a newspaper article about it. The district court asked Mr. Tanksley whether he had discussed the Queens verdict with the other jurors. The district court asked, "Since you have come in this morning, has there been any discussions in the jury room about the New York verdict?" (A. 181). Mr. Tanksley replied, "Indeed." The district court asked, "And it has been discussed by all the jurors or you and another juror." Mr. Tanksley responded, "I made comment after reading the article and there were other ears listening." (A. 181). He further stated, "I don't know if I had input into what I had made the comment about the verdict." [Sic].
 
 
 14
 The district court then asked Mr. Tanksley whether all of the jurors were there at the time. Mr. Tanksley replied, "No, all of them weren't there." (A. 182). The district court asked specifically whether Mr. Noweck had been there. At this juncture in the voir dire, Mr. Tanksley stated that Mr. Noweck was "the one that had the newspaper." (A. 182). He further stated that Mr. Noweck was sitting across the table from him when he made his comments. The district court asked whether Mr. Noweck responded to what Mr. Tanksley said. Mr. Tanksley stated, "No, because it was too closely in line, so we just...." However, before Mr. Tanksley could complete his sentence, the district court interrupted and asked him that if he were to continue to serve as a juror on the case, could he do so fairly and impartially. Mr. Tanksley replied, "Yes." (A. 182-83).
 
 
 15
 Juror Number Two, Jim Cosmis, was questioned. He indicated that he knew nothing from the media about the New York case involving the Queens verdict. However, he stated that he was present in the jury room when Mr. Tanksley mentioned what he had either seen on the television newscast or read in the newspaper, although Mr. Cosmis stated that he did not hear what was said. Mr. Cosmis was aware, however, that Mr. Tanksley had directed a newspaper article to Juror Number One, but stated that no one discussed it. (A. 184). He, too, assured the court that he could continue to serve fairly and impartially as a juror and return a verdict based on the evidence.
 
 
 16
 The last juror to be questioned was Juror Number Five, Ray Thomson. The district court asked, "What information do you have as to a case in another jurisdiction?" (A. 186). Mr. Thomson stated that he was "in and out of the room when the [television] news came on" but that he "seem[ed] to recall they were feeding somebody something." He recalled that they were talking about "millions of dollars" although he could not recall the exact amount. (A. 186). He affirmed that if he were to continue to serve as a juror in the case he could do so fairly and impartially. The last question propounded by the court was, "Were there any discussions in the jury room concerning what occurred in another case?" Mr. Thomson's response was "No, I stand out in the hallway. I didn't hear a word. I didn't even know that the article was in there because I was out in the hallway." The district court asked, "So if anybody did discuss it in the juryroom, you didn't hear the discussion?" Mr. Thomson replied, "No, I did not." This concluded the district court's voir dire.
 
 
 17
 Subsequently, the district court decided to reserve its decision on the Borough's mistrial motion, pending the verdict. The jury was then charged. Later that same day the jury returned a verdict in the amount of $1,135,716 for economic damages and $15,000,000 for pain and suffering. The Borough renewed its motion for a mistrial.
 
 
 18
 On October 2, 1992, the Borough filed post-trial motions for a new trial, amendment of the judgment and a motion that judgment not be entered against the Borough pending the resolution of the liability of the other defendants in the case. On November 13, 1992 the district court entered an order denying all of the Borough's motions, but stayed execution on the judgment to permit the defendants an opportunity to file an appeal. On December 9, 1992, the Borough filed its notice of appeal.
 
 
 19
 On appeal, the Borough asserts that the district court erred in denying its motion for a mistrial due to the jury's exposure to prejudicial extrajudicial information; that it erred in failing to grant a substantial remittitur of the pain and suffering award; that it erred in excluding testimony of other quadriplegics and in placing on the defendants the burden of proof as to mitigation of damages; erred in excluding evidence of the Borough's limited insurance coverage; erred in entering judgment against the Borough alone and erred in ordering post-judgment interest to run prior to the entry of final judgment.
 
 
 20
 We agree with the Borough that a new trial is warranted due to the jury's exposure to prejudicial extrajudicial collateral information. Therefore, we need not reach these other allegations of error,[3] but will vacate the judgment and remand to the district court for a new trial.[4]
 
 II.
 
 21
 It is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process. Thus, we have held that where a member of the jury may have learned extra-record information that could adversely affect the jury's ability to decide the case impartially on the record evidence alone, the trial court must determine whether the jury can be impartial and unprejudiced, and whether the jury can confine its deliberations to the record evidence. Gov't of Virgin Islands v. Dowling, 814 F.2d 134 (3d Cir.1987); United States, ex rel. Greene v. New Jersey, 519 F.2d 1356, 1357 (3d Cir.1975). "We have recognized that 'voir dire' is the appropriate method for inquiry into possible prejudice or bias on the part of jurors, and that the procedure used must provide a reasonable assurance for the discovery of prejudice." Gov't of Virgin Islands v. Dowling, 814 F.2d 134, 139 (3d Cir.1987); United States v. Pantone, 609 F.2d 675 (3d Cir.1979); United States v. Clapps, 732 F.2d 1148 (3d Cir.), cert. denied, 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); United States v. Jackson, 649 F.2d 967 (3d Cir.), cert. denied, 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981).
 
 
 22
 In United States v. Jackson, supra, we upheld a three-step procedure adopted by the district court to determine whether publicity during the course of trial had prejudiced the jury. First, a court determines whether the news coverage is prejudicial. Second, if it is, the court determines whether any jurors were exposed to the coverage. Third, if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality. United States v. Jackson, 649 F.2d at 976 (citing United States v. Margoles, 407 F.2d 727, 735, cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed. 2d 84 (1969)).[5]
 
 
 23
 We review a district court's order which denies a new trial based on alleged prejudicial information for abuse of discretion. Gov't of Virgin Islands v. Lima, 774 F.2d 1245, 1250 (3d Cir.1985). "We make this determination on the basis of an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." United States v. Gilsenan, 949 F.2d 90, 95 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2971, 119 L.Ed.2d 590 (1992) (citing United States v. Boylan, 898 F.2d 230, 262 (1st Cir.), cert. denied, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990)). The appellants have the burden of demonstrating the likelihood of actual prejudice. United States v. Clapps, 732 F.2d at 1152; United States v. Pantone, 609 F.2d at 679. Thus, we must determine, on the record before us, whether the Borough has demonstrated the likelihood that it suffered prejudice from the exposure of the jury to information regarding the Queens verdict.
 
 
 24
 In making this determination, we note that the method of conducting the voir dire is left to the sound discretion of the district court. Generally, a district judge need not pursue any specific line of questioning on voir dire. Any method is sufficient provided it is probative on the issue of impartiality. United States v. Brown, 938 F.2d 1482, 1485 (1st Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 611, 116 L.Ed.2d 633 (1991); Ristaino v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). Because voir dire determinations "rely largely on ... immediate perceptions", district courts have been awarded ample discretion in determining how best to conduct the voir dire. Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1991). However, in a case of substantial pretrial publicity, the voir dire must not simply call for the jurors' subjective assessments of their own impartiality. Moreover, the voir dire must not be so general that it does not adequately probe the possibility of prejudice. United States v. Boise, 916 F.2d 497, 505 (9th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); United States v. Polizzi, 500 F.2d 856, 879 (9th Cir.1975).
 
 III.
 
 25
 With these principles in mind, we turn to the Borough's assertions of error. The Borough contends that the district court, in ruling on the Borough's motion for a mistrial, erred in failing to apply a presumption of prejudice, in placing undue reliance on the jurors' assurances of continued impartiality, and in failing to voir dire the jury thoroughly. We agree with the Borough that, in light of the nature of the news reports, the district court relied too heavily on the jurors' assurances of continued impartiality. We also agree that the district court's voir dire was not sufficiently thorough to assess the likelihood of prejudice in this case. We find that a searching inquiry based on objective criteria was required under the circumstances of this case.
 
 
 26
 We do not find it necessary here to adopt a standard that would create a presumption of prejudice which would arise automatically from the substance of the news reports themselves.[6] Instead, we find that the district court's voir dire examination elicited sufficient information to suggest the existence of prejudice among the jury, but not enough information to confirm or dispel it.
 
 
 27
 In this case, at least half of the members of the eight member jury admitted to having direct knowledge of the Queens verdict. Four of the eight Waldorf jurors were directly exposed to the actual media coverage of the Queens verdict. Three of these jurors were specifically aware of the $30 million figure that had been awarded the quadriplegic in that case.
 
 
 28
 It is unclear from the record how many, if any, of the remaining three jurors, who were not examined on voir dire, were indirectly exposed to information regarding the Queens verdict, based on discussions among the jurors themselves. The trial court did not conduct a searching inquiry to ascertain what information these jurors had accumulated or how, and consequently had no way of objectively assessing the impact caused by the Queens verdict on the Waldorf verdict. The voir dire of the five jurors revealed that the New York Post article was physically present in the jury room just prior to the commencement of the jury's deliberations. The article was read by at least one of the jurors and shown to another. In addition to their review of the article, the article was the subject of "comment" by yet another juror. The juror who "made comment" admitted that "other ears were listening." The fact that jurors were not only aware of the Queens verdict, but were reading, commenting and circulating the article about that verdict in the jury room suggests its significance to these jurors. Despite this significance, we note the absence of any inquiry of the juror who "made comment" while "other ears were listening" as to the content of this "comment" (or comments as the case may be) or to whom it was addressed. Since there is no way of knowing what was said or who the "other ears" listening were, it is impossible to ascertain the extent of the entire jury's exposure to both the news reports and the discussions of the Queens verdict and how this exposure affected them in their deliberations. Thus, under these circumstances, we find that the court's inquiries uncovered a possibility that prejudice existed, but that those inquiries were not sufficient to ascertain whether there was a substantial likelihood of actual prejudice.
 
 
 29
 The fact that the five individually examined jurors stated that they could disregard their knowledge of the Queens verdict and decide the case solely on the evidence adduced in court does not alter our view. In Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), jurors gave similar assurances, yet the Supreme Court overturned the criminal defendant's conviction. Recognizing that the effect of exposure to extrajudicial, collateral information on a juror's deliberations may be substantial even though it is not perceived by the juror himself and recognizing that a juror's good faith may not be sufficient to counter this effect, courts have concluded that such assurances from jurors may not be adequate to eliminate the harm done by exposure to prejudicial information, including news reports. See, e.g., Irvin v. Dowd, 366 U.S. 717, 727-28, 81 S.Ct. 1639, 1645-46, 6 L.Ed.2d 751 (1961); United States v. Williams, 568 F.2d 464 (5th Cir.1978); United States v. Schrimsher, 493 F.2d 848, 854 (5th Cir.1974). Accord Silverthorne v. United States, 400 F.2d 627 (9th Cir.1968), cert. denied, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971) (whether a juror can render a verdict based solely on evidence adduced in the courtroom should not be adjudged on that juror's own assessment of self-righteousness without something more); Cummings v. Dugger, 862 F.2d 1504, 1509 (11th Cir.), cert. denied, 490 U.S. 1111, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989) (an individual juror's statement that he or she can remain impartial and put aside any prior opinions must be examined in light of the entire process of voir dire) (citing Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)); Wells v. Murray, 831 F.2d 468 (4th Cir.1987) ("veniremen's affirmations are not universal guarantees of juror's impartiality") (citing Murphy v. Florida, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037-38, 44 L.Ed.2d 589 (1975)). Here, too, we find that the jurors' statements of impartiality are insufficient to obviate the prejudicial nature of the information regarding the Queens verdict.[7] We agree with the view of the en banc majority in United States ex rel. Bloeth v. Denno, 313 F.2d 364, 372 (2d Cir.), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963), quoted in Silverthorne v. United States, 400 F.2d at 638, that in the absence of an examination designed to elicit answers which provide an objective basis for the court's evaluation, "merely going through the form of obtaining juror's assurances of impartiality is insufficient to test that impartiality."
 
 
 30
 We further observe with concern that only five of the eight jurors were questioned individually by the court. With respect to those jurors who did not respond to the court's initial inquiry,[8] we find the fact that they did not respond does not establish that the Queens verdict did not prejudice them as well. Knowledge of the Queens verdict could have reached the jurors in one of two ways. One source of the jurors' knowledge, as recognized by the district court, was the actual media coverage of the Queens verdict. The other source of this information could have been from another juror, family member or acquaintance. During the court's initial inquiries to the jury, en banc, and later during individual voir dire, there was virtually no inquiry regarding the discussions among the jurors themselves about the newspaper article which two of the jurors admitted to the court that they had read. The fact that one of the jurors thought the article was sufficiently significant to bring the newspaper article into the jury room and direct it to the attention of another juror compelled the district court to inquire as to the discussions surrounding the article. We note that the court did not ask the jurors if anyone else (family or friend) had mentioned the Queens case.
 
 IV.
 
 31
 We also find significant the fact that the jury was exposed to the Queens verdict both the night before and the very same day that it reached a verdict on Waldorf's damage claim. In United States v. Kum Seng Seo, 300 F.2d 623 (3d Cir.1962), we ordered a new trial when, during deliberations in the jury room, a juror circulated a clipping from a prejudicial story concerning the trial. In reversing the defendant's conviction and ordering a new trial, we noted that "a more critical moment would have been difficult to find." Id. at 625. United States v. Thomas, 463 F.2d 1061, 1065 (7th Cir.1972) ("an article that may be only marginally prejudicial in any other setting is likely to have a disproportionate impact here [at the beginning of deliberations]"). Cf. United States v. Gilsenan, 949 F.2d 90, 96 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2971, 119 L.Ed.2d 590 (1992) (where prejudicial information was received at the outset of the trial and was followed by a mass of evidence delivered over a 24-day, six-week period the alleged prejudicial information did not have an impact on the verdict).
 
 
 32
 Nor do we find that the risk of actual prejudice in this case is reduced due to the fact that the offending news coverage, involved here, dealt with a factually similar but nevertheless completely separate, unrelated case. This information was precisely the type specifically excluded by the district court during trial. See p. 707 supra.
 
 V.
 
 33
 In conclusion, we decide that the jurors' own, albeit good faith, assessments of impartiality were not sufficient under the circumstances of this case to insure that the damages awarded Waldorf were based on the evidence introduced at trial, and not based on a benchmark figure obtained from the jury's exposure to extrajudicial collateral information. Under the circumstances of this case, once the district court was made aware by counsel that a newspaper article had been brought into the jury room by one juror, reviewed by at least one other juror, and then followed by some level of comment or discussion, it was incumbent upon the district court to conduct a searching inquiry into the extent and nature of the prejudicial extrajudicial information that reached the jurors so as to ascertain for itself whether there was a substantial likelihood of prejudice such that a new trial was warranted.
 
 VI.
 
 34
 For the foregoing reasons, we will vacate the judgment and remand this case for a new trial on damages.
 
 
 
 [1]
 The record does not reveal Juror Noweck's and Juror Tanksley's first names
 
 
 [2]
 A videotape of the WNBC television news report and a copy of the New York Post article were submitted to the district court in support of the Borough's second motion for a mistrial. (The Borough was not initially aware of the impact of the newspaper article at the time it first moved for a mistrial.) We, too, have reviewed both the videotape of the television newscast and a copy of the New York Post article
 
 
 [3]
 Because these same issues may arise on retrial, we have reviewed each of these allegations, and find that they are without merit. Therefore, the district court did not abuse its discretion in denying the Borough's motion for a mistrial on any of these other grounds
 
 
 [4]
 We are not unmindful of how difficult yet another trial may be for the plaintiff, who has already been awarded two substantial verdicts by juries--only to lose them on appeal. As well, cognizant of the Seventh Amendment, we would not overturn a jury's verdict lightly
 
 
 [5]
 Waldorf observes that, "The trial court in this case strictly adhered to the procedures outlined in [these] cases." Appellee's brief at p. 27. This observation does not, however, end our inquiry, as this three part test merely provides a procedural framework for courts to utilize in evaluating extrajudicial prejudicial information. Our analysis, must therefore focus on the substantive aspects of this inquiry
 
 
 [6]
 The "presumption of prejudice" urged by the Borough has its genesis in a United States Supreme Court decision in the criminal case, Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), in which the Court held that "[i]n a criminal case, any private communications, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial.... The presumption is not conclusive, but the burden rests heavily upon the [party opposing the motion] to establish ... that such contact with the juror was harmless to the defendant." 347 U.S. at 229, 74 S.Ct. at 451. See also Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892)
 Although some courts have recognized the presumption in a civil context, we do not find that the circumstances of this case are sufficiently aggravated to give rise to a presumption of prejudice to appellants. United States v. D'Andrea, 495 F.2d 1170, 1172 n. 5 (3d Cir.1974). See, also, United States v. Boylan, 898 F.2d 230 (1st Cir.1990) (we believe that the facts of the instant matter distinguish it from matters where the probability of jury prejudice is intolerably great).
 In some cases the publicity that occurs is so fundamentally prejudicial that actual prejudice is presumed as a matter of law. Where the improper publicity is of a less serious nature however, no similar presumption operates. In these cases, the appellate court (like the district court) must review the circumstances surrounding the exposure of the jury to the publicity and order a new trial only when the substantial prejudice has occurred.
 Id. at 1172 n. 5 citing U.S. ex rel. Doggett v. Yeager, 472 F.2d 229, 239 (3d Cir.1973) (citations omitted).
 
 
 [7]
 We observe that these cases and the procedures for dealing with exposure to prejudicial extrajudicial information have developed largely in the context of criminal trials. Nevertheless, we find them applicable here
 We observe, too, that the prejudicial news report implicated here involved a factually similar, but nonetheless completely unrelated case. This fact, however, does not change our analysis.
 
 
 [8]
 The transcript disclosed the following, by the district court:
 I want to make inquiry of you as to whether or not anybody saw or viewed channel four news last night at 11:00. Anybody see it?
 (A. 174)
 Mr. Thomson: I saw it.
 The Court: Your name:
 Mr. Thomson: Ray Thomson.
 The Court: Mr. Thomson, there was a discussion of that program about a case in New York City.
 Did you hear that discussion, without telling us anything about?
 Mr. Thomson: Well, I was in and out of the room, so is it something similar to what we're going through?
 The Court: It was concerning a case.
 Mr. Thomson: I don't know. It could be. I could have heard something.
 The Court: So the next question is: Have you in any way discussed what you saw on channel four, may have seen on channel four with the other jurors here today?
 Mr. Thomson: No.
 The Court: And I would direct you not to do that. Okay. I may want to speak to you privately. Nobody else saw channel four last night?
 Did anybody see any TV coverage last night where there was a discussion of a case in New York City?
 (A. 174-75).
 The Court: Aside from what was on TV last night, was there--has anyone in any other media device, newspaper or anything read about a case in New York?