RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WILLIAM EUGENE THOMPSON,

*Petitioner-Appellant,*

*v.*

No. 13-6085

PHILIP W. PARKER, Warden,

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 5:11-cv-00031—Thomas B. Russell, District Judge.

Argued: October 19, 2016

Decided and Filed: August 14, 2017

Before: BOGGS, GRIFFIN, and WHITE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, La Grange, Kentucky, for Appellant. Jason Bradley Moore, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Dennis J. Burke, Krista A. Dolan, DEPARTMENT OF PUBLIC ADVOCACY, La Grange, Kentucky, for Appellant. James Hays Lawson, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

---

**OPINION**

---

BOGGS, Circuit Judge.  In 1986, Petitioner William Thompson, having served twelve years of a life sentence for an unrelated murder for hire, killed his prison-farm supervisor, stole his wallet, keys, and pocketknife, and fled.  Thompson was captured at a bus station in Madisonville, Kentucky, and charged with murder, robbery, and escape, for which he was tried by jury and sentenced to death, twenty years, and ten years, respectively.  Because the trial court abused its discretion in refusing to excuse certain jurors from the case and because Thompson's prior conviction for murder was improperly used as an aggravating circumstance, Thompson was granted a retrial on direct appeal.  *Thompson v. Commonwealth*, 862 S.W.2d 871, 877 (Ky. 1993).  In 1995, on retrial, Thompson pleaded guilty to all three counts as part of a plea agreement to avoid jury sentencing.  The Commonwealth sought jury sentencing anyway, the trial court denied the request, the Commonwealth appealed, and the court of appeals ruled that the Commonwealth was entitled to jury sentencing despite the plea agreement.  *Commonwealth v. Thompson*, No. 95-CA-0136-MR (Ky. Ct. App. June 10, 1996) (unpublished).  The jury returned a death-penalty verdict, finding two aggravating factors: (1) Thompson had previously committed a murder, and (2) Thompson committed the present murder against a prison guard while in prison.  The trial court accordingly sentenced Thompson to death.

In state post-conviction habeas corpus proceedings, Thompson succeeded on his claim that the trial court had failed to hold a mandatory competency hearing.  *Thompson v. Commonwealth*, 56 S.W.3d 406, 407, 410 (Ky. 2001).  Thompson was unsuccessful on all his other state claims for relief, however, and after the trial court held the required competency hearing and found that Thompson had been competent to plead guilty, the Kentucky Supreme Court affirmed Thompson's convictions and sentences.  *Thompson v. Commonwealth*, 147 S.W.3d 22, 34, 55 (Ky. 2004), *reh'g denied* (Nov. 18, 2004), *cert. denied*, 545 U.S. 1142 (2005).  The Kentucky Supreme Court also affirmed the denial of Thompson's motion to vacate, set aside, or correct his sentence under Ky. R. Crim. P. 11.42.  *Thompson v. Commonwealth*, No. 2009-SC-000557-MR, 2010 WL 4156756, at *1, *5 (Ky. Oct. 21, 2010, as modified on

denial of reh'g, Jan. 20, 2011) ("Rule 11.42 proceedings").  Thompson then filed a federal habeas corpus petition raising seven claims:

> (1) the jury considered extraneous evidence;
>
> (2) trial counsel rendered ineffective assistance;
>
> (3) the prosecutor made improper closing arguments to the jury;
>
> (4) the trial court improperly restricted Thompson's voir dire questioning;
>
> (5) in violation of *Mills v. Maryland*, 486 U.S. 367, 384 (1988), the penalty-phase jury instructions implied that certain mitigators had to be found unanimously to be considered;
>
> (6) the Kentucky Supreme Court's proportionality-review process is unconstitutional; and
>
> (7) the cumulative effect of the errors at trial denied Thompson his constitutional rights.

R. 13 at 12–59.

The district court heard and denied Thompson's federal habeas petition, from which Thompson now appeals on the first, fifth, and sixth grounds.  Thompson claims that (1) the jury improperly considered extraneous evidence when it discussed a news account about another violent criminal who had committed a murder after earning parole at age seventy; (2) the jury instructions violated *Mills v. Maryland*, 486 U.S. 367 (1988) because they stated that the "verdict" had to be returned unanimously but did not expressly state that unanimity was *not* required in order for a juror to find a mitigating factor, potentially leading jurors wrongly to infer that finding at least some mitigating factors also required unanimity; and (3) the Kentucky Supreme Court did not adequately conduct a comparative-proportionality review in assessing whether Thompson's death sentence was excessive or disproportionate to the penalty imposed in similar cases.  For the reasons that follow, we affirm.

**I**

As a threshold matter, the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, which amended 28 U.S.C. § 2254, governs our review of the Kentucky Supreme Court's denial of post-conviction relief because Thompson filed his federal petition after AEDPA's effective date, even though Thompson's conviction arises out of a 1986 homicide.  *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997).  AEDPA sets forth "an independent, high standard to be

met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007).  Under AEDPA, for any "claim that was adjudicated on the merits" by Kentucky state courts, we defer to the state courts' factual determinations, we may not expand the record beyond that which the state courts reviewed, *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and we may grant habeas relief only if the adjudication of that claim "(1) resulted in a decision that was *contrary to*, or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d) (emphases added). "A state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are independent of each other: a state-court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state court's ruling is an "unreasonable application" of clearly established federal law, on the other hand, "if the state court identifies the correct governing legal rule" or principle from Supreme Court precedent but "applies it to the facts of the particular state prisoner's case" in an unreasonable manner, including by "unreasonably extend[ing]" or "unreasonably refus[ing] to extend" the principle.  *Id.* at 407.  In both cases, in identifying governing legal rules, we may look only to the holdings of the Supreme Court's decisions, not the dicta.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

With these parameters in mind, we proceed to the merits of Thompson's claims.

## II

### *Extraneous Evidence*

Thompson argues that, in violation of his Sixth and Fourteenth Amendment rights, his jurors improperly considered extraneous evidence: a news account (read, seen, or heard by one of them or, perhaps, heard *about* by one of them) concerning another violent criminal who had been imprisoned and yet committed a murder after being paroled at age 70. Thompson argues that discussion of this news account played on jurors' fears that, if Thompson was ever released from prison, he would still be a danger to society no matter his age.[1] Thompson's proof that jurors discussed the news account during deliberations included an affidavit from the jury foreman and the foreman's testimony at an evidentiary hearing.

In the Rule 11.42 proceedings, the state supreme court held that Thompson's extraneous-evidence claim was barred because it could or should have been raised on direct appeal, *Thompson*, 2010 WL 4156756, at *5, but the Warden in federal habeas proceedings conceded that it was not barred—and indeed, that none of Thompson's claims were barred whether for failure to exhaust, procedural default, or otherwise. R. 19 at 2. The district court agreed that this claim was not barred:

> Thompson contends, and Respondent acknowledges, that this claim was not procedurally defaulted because the Kentucky Supreme Court does not regularly follow the procedural rule it applied to deny Thompson's claim without reaching the merits. Thompson's claim is not a claim that he could have and should have raised on direct appeal, and Kentucky courts do allow such claims to be brought in a RCr 11.42 motion. *See Bowling v. Commonwealth*, 168 S.W.3d 2, 9–10 (Ky. 2004). Therefore, Thompson's claim is not procedurally defaulted. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

R. 30 at 5.

The district court then held, correctly, that because the Kentucky courts had not adjudicated this claim on the merits, AEDPA deference did not apply. *Ibid.*; *see Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). Further, because Thompson did not lack diligence in

---

[1]At the time of Thompson's trial, the severest non-capital sentence for which he was eligible was life without the possibility of parole for twenty-five years. *See Thompson*, 2010 WL 4156756, at *3.

developing the factual record in state court, the district court was permitted to hold an evidentiary hearing as to this claim, and to cite the facts developed at that hearing. *See Pinholster*, 563 U.S. at 184.

At the evidentiary hearing (which, of course, was held fourteen years after the jury trial), the jury foreman testified that he did not remember details of the deliberations but that the news account "was brought up probably after two or three votes or whatever . . . I just remember it was brought up and that was it." R. 42 at 13. The foreman testified that "it was probably a 9-to-3 or 8-to-4 . . . vote at that time, and there was three holdouts or whatever to the end until the last vote. And it was probably brought up sometime during that period." *Id.* at 14. The foreman testified that no one physically brought newspaper articles or anything similar into the jury room, but rather that someone had mentioned the story in the course of the jury's deliberations. The district court denied relief, holding that "[a] discussion of a news story about an unrelated crime does not constitute extrajudicial evidence which would set aside a verdict."

We review the district court's denial of habeas relief de novo, *Bigelow v. Williams*, 367 F.3d 562, 569 (6th Cir. 2004), and we affirm.

Under the Sixth and Fourteenth Amendments, a criminal defendant is entitled to "a fair trial by a panel of impartial, 'indifferent' jurors." *Morgan v. Illinois*, 504 U.S. 719, 726–27 (1992) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). "In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial," *id.* at 727, without regard to any extraneous influences. *See Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it . . . ."); *Sheppard v. Maxwell*, 384 U.S. 333, 351, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences"; the jury's verdict must be based on "evidence received in open court, not from outside sources").

But impartiality and indifference do not require ignorance. Because "jurors will have opinions from their life experiences, it would be impractical for the Sixth Amendment to require that each juror's mind be a tabula rasa." *United States v. Jones*, 716 F.3d 851, 857 (4th Cir.

2013). Indeed, it would not only be impractical but also undesirable: for jurors to evaluate the evidence before them and do their job intelligently, they must take into account rather than ignore what general knowledge they may have gained from their life experiences.

> So far from laying aside their own general knowledge and ideas, the jury should have applied that knowledge and those ideas to the matters of fact in evidence in determining the weight to be given to the opinions expressed; and it was only in that way that they could arrive at a just conclusion. While they cannot act in any case upon *particular facts material to its disposition resting in their private knowledge*, but should be governed by the evidence adduced, they may, and *to act intelligently they must*, judge of the weight and force of that evidence *by their own general knowledge* of the subject of inquiry.

*Head v. Hargrave*, 105 U.S. 45, 49 (1881) (emphases added).

There is thus a bright line, and rightly so, between, on the one hand, jurors' taking into account "their own wisdom, experience, and common sense," *Doan v. Brigano*, 237 F.3d 722, 734 (6th Cir. 2001), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003), when evaluating the evidence admitted at trial, and, on the other hand, jurors' employing extraneous evidence such as news reports *of the case being decided by the jurors*, e.g., *Nevers v. Killinger*, 169 F.3d 352, 366 (6th Cir. 1999), *abrogated on other grounds by Harris v. Stovall*, 212 F.3d 940, 942–43 (6th Cir. 2000); or physical news items being brought into the jury room, *e.g.*, *Wiley v. State*, 332 S.W.2d 725, 726 (Tex. Crim. App. 1960) (reversing death sentence where one juror brought in a local newspaper clipping containing a recent news story, which the foreman read aloud to the jury and which began: "Tom Ainsworth, 40, convicted murderer from Cut'n Shoot, celebrated the end of his parole Thursday night by buying a jug of gin and then killing a man"); *Waldorf v. Shuta*, 3 F.3d 705, 710–11 (3d Cir. 1993) (jurors were "reading, commenting [on,] and circulating" a highly prejudicial New York Post article in the jury room).

Thompson relies principally on *Nevers* and on various decisions of our sister circuits such as *Waldorf*. But none of Thompson's cited authorities support the proposition that merely *discussing* a news story about *another case* that one or some of the jurors *might have read or seen or heard about* is analogous either to seeing extraneous reports *about the case the jurors are deciding* or to having physical news items such as newspaper clippings either provided to jurors or brought into the jury room by jurors.

The jury's sole task in this case was to set Thompson's punishment. Its options were to impose a term of imprisonment for a number of years no less than twenty, a life sentence with the possibility of parole, or a death sentence. Surely, the jury's deliberations would naturally include discussing such considerations as the likelihood that Thompson, if released even at an old age, would kill again. And in the context of such deliberations, the jurors' general knowledge about recidivism, even if it includes recollections of unrelated news coverage of other crimes, is fair game for discussion.

To hold otherwise would have curious (and undesirable) implications about the sort of "evidence" that might be considered extraneous. What if, for example, a juror were an actuary who had general knowledge of the life expectancy of someone similarly situated to the defendant: would that juror's discussion of the defendant's odds of reoffending be "extraneous evidence" and thus violate the defendant's constitutional rights? Or, what if the jurors in this case, instead of discussing a news story, had discussed a story that had been related in a novel? Would all general knowledge gleaned from reading books be considered "extraneous evidence"? Or only from reading nonfiction books?

It therefore makes sense that, at a minimum, to be considered extraneous evidence, the evidence must either relate to the case that the jurors are deciding or be physically brought to the jury room or disseminated to the jury. *Cf. Warger v. Shauers*, 135 S. Ct. 521, 529 (2014) (holding, in a civil case, that "'[e]xternal' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room").

### III

### *Jury Instructions*

Thompson's next claim is that his jury instructions, in violation of the Eighth Amendment as interpreted in *Mills v. Maryland*, 486 U.S. 367, 384 (1988), improperly implied that the jury had to find mitigating factors *unanimously* in order to consider them. This claim is subject to AEDPA deference because the state supreme court reached the merits in rejecting it. *Thompson*, 147 S.W.3d at 47–48 (holding, in the alternative, that this claim was both

unpreserved and meritless). The district court denied Thompson's claim and we review that denial de novo. *Bigelow*, 367 F.3d at 569.

The Eighth Amendment requires the jury to have the ability "to consider and give effect to all relevant mitigating evidence" offered by the defendant. *Boyde v. California*, 494 U.S. 370, 377–78 (1990). To that end, it is unconstitutional for a state to require jurors to agree unanimously on the existence of a mitigating factor. *Mills*, 486 U.S. at 384. In *Mills*, the verdict form stated: "Based upon the evidence we *unanimously* find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist . . . and each mitigating circumstance marked 'no' has not been proven . . . ." *Id.* at 387 (emphasis added). The verdict form contained a list of seven potentially mitigating circumstances and an eighth marked "other." *Ibid.* Next to each was written "yes" or "no," and the jury was to indicate its finding. *Ibid.* The Supreme Court rejected these instructions because the jury could not find any mitigator to exist unless the jurors agreed unanimously that *that* mitigator existed. *Id.* at 377–84; *see also United States ex rel. Kubat v. Thieret*, 679 F. Supp. 788, 813 (N.D. Ill. 1988) ("If . . . you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the form which so indicates." (emphasis omitted)) (following *Mills*), *aff'd*, 867 F.2d 351 (7th Cir. 1989).

Our court has held that "the proper inquiry" under *Mills* "is whether a reasonable jury *might have interpreted* the instructions in a way that is constitutionally impermissible." *Coe v. Bell*, 161 F.3d 320, 337 (6th Cir. 1998). But the Supreme Court has made clear that what violates the Eighth Amendment is requiring jurors to *find mitigators* unanimously—not, for example, requiring jurors to weigh aggravators against mitigators and find unanimously that the aggravators outweigh the mitigators. *See Smith v. Spisak*, 558 U.S. 139, 147–48 (2010). In *Spisak*,

> The judge gave the jury two verdict forms for each aggravating factor. The first of the two forms said:
>
>> "'We the jury in this case . . . do find beyond a reasonable doubt that the aggravating circumstance . . . was sufficient to outweigh the mitigating factors present in this case.

> "'We the jury recommend that the sentence of death be imposed . . . .'"

The other verdict form read:

> "'We the jury . . . do find that the aggravating circumstances . . . are not sufficient to outweigh the mitigation factors present in this case.
> "'We the jury recommend that the defendant . . . be sentenced to life imprisonment . . . .'"

The instructions and forms made clear that, to recommend a death sentence, the jury had to find, unanimously and beyond a reasonable doubt, that each of the aggravating factors outweighed any mitigating circumstances. But the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously. Neither the instructions nor the forms said anything about how—or even whether—the jury should make individual determinations that each particular mitigating circumstance existed. They focused only on the overall balancing question. And the instructions repeatedly told the jury to "conside[r] all of the relevant evidence." In our view the instructions and verdict forms did not clearly bring about, either through what they said or what they implied, the circumstance that *Mills* found critical, namely,

> "a substantial possibility that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."

We consequently conclude that the state court's decision upholding these forms and instructions was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" in *Mills*.

*Id.* at 147–49.

Thompson's jury instructions were worded far more closely to those in *Spisak* than to those in *Mills*. Indeed, Thompson himself characterizes his jury instructions as requiring the "verdict" to be unanimous but being "*silent* as to the [sic] whether the finding of aggravating and mitigating circumstances had to be unanimous, improperly impl[ying]that the finding of mitigating factors by the jury had to be unanimous." Pet'r's Br. 4–5 (emphasis added). Thompson's argument is that the instructions, in using the word "you," were ambiguous and on

the whole implied that "you the *jury*" rather than "you the *juror*" had to find mitigators to exist. Unlike the instructions in *Mills*, however, nothing expressly required the jury to find mitigating factors unanimously. And we have previously upheld an instruction "that an *aggravating* factor had to be found unanimously, but [that] was silent with regard to how many had to agree in finding a mitigating factor." *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120 (6th Cir. 1990) (en banc) (Kennedy, J., writing for the majority on this issue). Thompson's jury instructions required that "the jury find beyond a reasonable doubt" that an aggravating circumstance or circumstances existed.

We noted at oral argument, however, that—although not raised by Thompson or addressed by the district court—one of Thompson's jury instructions actually used the phrase "you the jury" (rather than only "you") in discussing mitigating factors:

> INSTRUCTION NUMBER TWO ENTITLED MITIGATING CIRCUMSTANCES:
>
> In fixing a sentence for the defendant for the offense of murder, you shall consider such mitigating or extenuating facts and circumstances as has [sic] been presented to you in the evidence and you believe to be true, including but not limited to such of the following as you believe from the evidence to be true: A. That the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, even though the influence of extreme mental or emotional disturbance was not sufficient to constitute a defense to the crime. B. At the time of the offense, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental illness, even though the impairment of the capacity of the defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of the law was insufficient to constitute a defense to the crime and C. Any other circumstance arising from the evidence which ***you the jury*** deem to have mitigating value. In addition to the foregoing, you shall consider those aspects of the defendant's character, background and those facts and circumstances of the particular offense of which he is guilty, to-wit: the murder of Charles Fred Cash, about which he has offered evidence in mitigating [sic] of the penalty to be imposed upon him and which you believe from the evidence to be true. [changed because this is how the format appears in the cited trial transcripts.]

Trial Tr. at 1237–38 (emphasis added).**²**

A reasonable jury might well have interpreted this instruction to mean that, in addition to the mitigators contemplated in items A and B of the instruction, the jury should consider certain mitigators described in item C found by "you the jury"—i.e., the jury as a whole.**³** Even so, in light of *Spisak*, the state court did not unreasonably apply *Mills* in finding the jury instructions constitutional.

That is because, as was the case in *Spisak*, nothing in Thompson's jury instructions actually required the jury (or any individual jurors) to *make a determination* as to the presence or absence of mitigators in the first place. Indeed, Thompson's jury instructions made clear that the jurors had to find aggravating factors "beyond a reasonable doubt," Trial Tr. at 1237, and that the jurors could not impose the death penalty (or a sentence of life without parole for a minimum of 25 years) without finding and specifying an "aggravated circumstance or circumstances," *id.* at 1489, on a verdict form that had to be "unanimous," *id.* at 1241. Moreover, the jurors here were instructed:

> If you have a reasonable doubt as to the truth or existence of any aggravating circumstance listed in Instruction No. 3, you shall not make any finding with respect to it.
>
> If, upon the whole case, you have a reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment.

*Id.* at 1486.

The Supreme Court held that the instructions in *Spisak* did not violate *Mills*, and we therefore must conclude that the Kentucky courts' upholding the jury instructions in this case was not "contrary to" or "an unreasonable application of, clearly established Federal law, as

---

**²**In setting forth the "relevant portions of the jury instructions," R. 42 at 46, the district court omitted most of the text of this seemingly relevant jury instruction.

**³**On the other hand, immediately following the "you the jury" language, the instruction states that "[i]n addition to the foregoing, you shall consider those aspects of the defendant's character, background and those facts and circumstances of the particular offense of which he is guilty, . . . about which he has offered evidence in mitigating of the penalty to be imposed upon him and which you believe from the evidence to be true." This catchall language mitigates concern that the jury may have concluded that item C required that their consideration of "other circumstances" as mitigating be confined to those that the jury found as a whole.

determined by the Supreme Court of the United States" in *Mills*.  The jury here was instructed to consider all the evidence before it, to consider the potentially aggravating and mitigating factors introduced at trial, and to issue a unanimous verdict.  According to the instructions, returning a death-penalty verdict required the jury to find, beyond a reasonable doubt, the existence of aggravating factors, and the jury was required to list the specific aggravating factors that the jury had collectively found.  In contrast, the jury instructions and verdict form did not instruct the jury that a juror individually could not decline to return a sentence of death on account of a mitigating circumstance unless the jury unanimously found that circumstance to exist.  Simply put, Thompson's instructions are easily distinguishable from those in *Mills*.  Thus, Thompson has failed to show that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 562 U.S. at 102.

**IV**

***Proportionality Review***

Finally, Thompson argues that the Kentucky Supreme Court's proportionality review was unconstitutional because the universe of "similar" cases to which his was compared was too small.  That court looked only to those cases where a death sentence was imposed.  Thompson contends that the court should also have looked to similar cases where a death sentence, though sought, was not imposed.  This claim was adjudicated on the merits in the Kentucky courts, so AEDPA deference should apply; the district court, however, reviewed this claim de novo, and the Warden has not asked us to apply AEDPA deference on appeal.  Thompson, however, has used the language of AEDPA deference in his brief and his reply brief.  Pet'r's Br. 46 ("contrary to clearly established law"), 47 ("contrary to, or an unreasonable application of, clearly established federal law"), Reply Br. 10 ("contrary to, or based upon an unreasonable application of, clearly established federal law").

We need not enter the thicket of whether AEDPA deference applies, however, because whether it does or does not, Thompson's claim still fails.

We first note that Thompson has raised three arguments on appeal, only one which was presented to the district court.  "The clear rule is that appellate courts do not consider issues not

presented to the district court." *Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir. 1983). We therefore decline to address the following two arguments that Thompson did not raise below: (1) the proportionality review in his case was constitutionally flawed not only because the comparison group was too small, but also because the court "made no effort to compare the facts and circumstances of Thompson's life and background to the lives of the people within the comparison group"; and (2) the comparison group of non-excessive-death-penalty cases used in the proportionality review improperly included some decided before the Supreme Court, in *Furman v. Georgia*, 408 U.S. 238 (1972), held the death penalty unconstitutional—i.e., cases in which the death sentences were presumptively excessive. *See McCleskey v. Kemp*, 481 U.S. 279, 301 (1987) (explaining that prior to *Furman*, "the death penalty was so irrationally imposed that any particular death sentence could be presumed excessive").

The argument that Thompson has preserved is that the Kentucky Supreme Court violated his constitutional right to due process by failing to require a better comparative-proportionality review (i.e., comparing Thompson's sentence to those others have received), which we note is different from inherent-proportionality review (i.e., comparing the severity of the sentence to the gravity of the crime). *See Pulley v. Harris*, 465 U.S. 37, 42–44 (1984). But there is no constitutional entitlement to any comparative-proportionality review, a fact that Thompson readily admits. *See id.* at 43–46, 50–51; Pet'r's Br. 40, 45. Thompson argues that Kentucky's proportionality-review statute confers upon him a liberty interest that is in turn protected by the Fourteenth Amendment Due Process Clause. But Thompson's federally protected liberty interest created by that statute, at most, is an interest in having the Kentucky Supreme Court *follow that statute*, which it did. That court compared Thompson's case to those of other defendants sentenced to death for a single murder and specifically cited two of those other cases. *Thompson*, 147 S.W.3d at 54–55. That analysis was sufficient to satisfy Kentucky law. *See* Ky. Rev. Stat. Ann. § 532.075(3)(c), (5); *Bowling v. Parker*, 344 F.3d 487, 522 (6th Cir. 2003). And when it comes to a petitioner's liberty interest in state-created statutory rights, absent some other federally recognized liberty interest, "there is no violation of due process as long as Kentucky follows its procedures." *Id.* at 522.

Thus, even on de novo review, Thompson's proportionality-review claim fails.

**V**

The order of the district court is **AFFIRMED**.