**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| IN RE:  ANGELES ROCA FIRST JUDICIAL DISTRICT PHILADELPHIA COUNTY | : | No. 42 EAP 2016 |
| | : | |
| | : | Appeal from the Order dated 12/16/16 |
| | : | of the Court of Judicial Discipline at No. |
| | : | 14 JD 2015 |
| | : | |
| | : | |
| APPEAL OF:  ANGELES ROCA | : | ARGUED:  May 9, 2017 |

***OPINION***

**CHIEF JUSTICE SAYLOR**                              **DECIDED:  November 22, 2017**

This is an appeal from an order of the Court of Judicial Discipline (the "CJD") removing Appellant from office.  One issue we are asked to address is whether that tribunal must apply the doctrine of *stare decisis* when sanctioning a jurist.

**I. Background**

The underlying facts were developed at trial before the CJD and via stipulation.[1] At all relevant times Appellant served as a Philadelphia common pleas judge in the family division.  Her term overlapped with those of former Philadelphia Municipal Court Judges Joseph Waters and Dawn Segal.[2]  During this period, the FBI was investigating

---

[1] *See* Judicial Conduct Board Second Amended Pre-Trial Memorandum at 5-15 (setting forth the Board's proposed stipulation); N.T., Sept. 8, 2016, at 14 (reflecting Appellant's concurrence with the stipulation and the CJD's acceptance of it into the record).

[2] Former Judge Waters later resigned from office and pled guilty to federal corruption charges.  Separately, the CJD removed former Judge Segal from office.  For brevity they will be referred to simply as Waters and Segal.

Waters' activities; the investigation included wiretap surveillance of his telephone communications. Several conversations between Waters and Appellant were recorded in 2011 and 2012.

In September 2011, Appellant called Waters regarding Judge Adam Beloff.[3] In the call, Appellant told Waters that the son of a court employee was to appear before Beloff on drug charges and asked whether Beloff would be receptive to discussing that case *ex parte*, to which Waters responded in the affirmative. Appellant then confirmed that she had Beloff's phone number, and Waters stated that he would speak with Beloff in person. *See* Board Exh. 17, transcript, at 1-2.

In June 2012, Appellant asked Waters for advice on how her son, Ian Rexach, should proceed relative to a tax judgment. By way of background, Rexach owned a barbershop in Philadelphia. The city filed a code enforcement complaint against him for failure to pay the city's business privilege tax. When he did not appear for the hearing, a $5,000 default judgment was entered against him. He filed a *pro se* petition to open the judgment, which was denied due to the lack of a meritorious defense. Thereafter, a phone conversation occurred between Appellant and Waters, which included the following excerpt:

> Appellant: I have a question . . . Can you file a motion for reconsideration with [Segal]?
>
> Waters: Yeah. You file a Motion for Reconsideration with her and I'll talk to her.
>
> Appellant: Huh?
>
> Waters: I said file a Motion for Reconsideration with her and I'll talk to her.
>
> Appellant: Okay.

---

[3] Beloff, a Philadelphia common pleas judge in the criminal division, died in 2012.

Waters:  Why didn't you call me first?

Appellant:  Because I didn't know it was late, so I just sent him over and I said, "Just go open it."  I didn't know it was beyond the 30 day period.  Otherwise, I would have called.

Waters:  Yeah.

Appellant:  It was on May 15th and he wrote in the petition, "I apologize I got this mixed up with another court date in Municipal Court," and then he wrote, "I wish to reopen my case so that I can resolve this matter and make payments."  The bitch denied it.  That's a pretty good . . . [laughs] . . . I mean it's not a legal defense, but give me a break.

Stipulation ¶19.  From the above, Appellant understood that Waters would talk to Segal about the petition in her son's case.  Appellant did not attempt to dissuade him from doing so.  *See id.* ¶20.

Appellant learned that Segal would not be presiding over these types of petitions after June 29, 2012.  Seeking to ensure that Segal presided over her son's petition, on June 29, 2012, Appellant called Waters to encourage him to intervene, as follows:

Appellant:  Do you have [Segal's] number?

Waters:  Who?

Appellant:  Dawn Segal.

Waters:  Uh.

Appellant:  He [Rexach] just filed for reconsideration.  They said she [Segal] does 'em right today.  So we need to call her today.

Waters:  Oh.  Okay.  I'll call Dawn right now.  All right.

Appellant:  It's Ian Rexach.  She said call Monday and by Monday she [Segal] would have already decided the decision [sic].

Waters:  All right.  What's his name?

Appellant:  It's Ian Rexach. . . .

Waters:  . . . I'll call her right now.

Appellant:  And it was a Motion for Reconsideration.  All right?

Waters:  All right.  Bye-bye.

Appellant:  Thank you . . ..

*Id.* ¶27.  From this conversation, Appellant understood that Waters would call Segal on behalf of Appellant's son in regard to the petition for reconsideration.  *See id.* ¶28.

That day, Segal reviewed the petition for reconsideration and issued a rule to show cause why the relief requested should not be granted.  Although Segal did not preside over Rexach's case thereafter, on July 1, 2012, she called Waters to advise him that she "took care of it" and to "tell her it's done."  Waters then called Appellant and left a voice message stating that Segal had just stated that "she took care of that thing," *i.e.*, Rexach's petition for reconsideration.  Waters again called Appellant and discussed the matter, confirming that it had been "taken care of" by Segal.  Appellant responded, "All right.  Cool.  Thanks."  The default judgment against Rexach was ultimately vacated and the case against him was withdrawn upon his payment of $477 in taxes.  *Id.* ¶¶30-39.

In 2013, FBI agents interviewed Appellant in the presence of her attorney.  During the interview, Appellant denied that judges call each other asking for favors.  She stated, "We don't do that here at all."  Stipulation ¶41.  She added that she would never call another judge to request a favor for a family member.  *See id.* ¶¶42-43.  Further, when asked in the interview what she would do if a family member was in trouble, Appellant stated that "they would be on their own."  N.T., Sept. 8, 2016, at 187.

In March and May of 2015, the Judicial Conduct Board sent Appellant informal letters of inquiry concerning her contacts with other judges.  At the time, Appellant was unaware that her conversations with Waters had been recorded.  In her written

responses, Appellant made several representations which were inconsistent with the content of the recorded phone conversations. For example, she indicated that: she only had one conversation with Waters, limited to procedural advice about a petition for reconsideration in the *City of Philadelphia v. Rexach* matter; after advising her son to file a motion for reconsideration, she had no further contemporaneous knowledge about the case; she never requested preferential treatment in the *Rexach* case and, to her knowledge, none was given; Waters never offered to request special consideration from Segal; Appellant was not aware of whether Waters actually had contacted Segal, and if Waters did contact Segal, it was without Appellant's knowledge. *See id.* ¶¶44-55.

After Appellant met with a federal prosecutor and heard the recordings of the intercepted conversations, she supplemented her written responses to the Board, admitting that Waters offered to speak to Segal on her behalf, and that she did not discourage him from taking such action. Appellant also conceded that she had placed a second call to Waters asking him to request that Segal consider the *Rexach* matter promptly, and that Waters eventually told Appellant it was "taken care of." Appellant added, "I should have stayed out of the matter completely." *Id.* ¶¶56-61.

Finally, despite her knowledge that Waters engaged in *ex parte* communication with Segal, Appellant did not report his misconduct to the Board. *Id.* ¶62.

In June 2016, the Board filed an amended complaint with the CJD alleging that Appellant had violated Article V, Sections 17(b) and 18(d)(1) of the Pennsylvania Constitution, as well as several provisions of Pennsylvania's former Code of Judicial Conduct (the "Code"), mentioned below.[4] The alleged Section 17(b) violation was

---

[4] The former code took effect in 1974 and was amended periodically. It was replaced entirely on July 1, 2014. Because the alleged misconduct occurred before that date, the former code presently applies. Accordingly, in this opinion we will refer to the Code of Judicial Conduct and its canons as reflected in the former code.

derivative of a Code violation, as Section 17(b) prohibits judges from "violat[ing] any canon of legal or judicial ethics prescribed by the Supreme Court." PA. CONST. art. V, §17(b). As for Section 18(d)(1), that provision states that judicial officers may not engage in conduct which, among other things, "prejudices the proper administration of justice or brings the judicial office into disrepute," PA. CONST. art. V, §18(d)(1), and it also indicates that any transgression of these standards or of Section 17 can subject the jurist to discipline, up to and including suspension or removal from office. *See id.* The complaint alleged that Appellant had, indeed, prejudiced the proper administration of justice or brought the judicial office into disrepute.

The Code provisions at issue were Canons 2A, 2B, and 3A(4), which state:

**Canon 2. Judges should avoid impropriety and the appearance of impropriety in all their activities.**

A. Judges should . . . conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. Judges should not allow their family, social, or other relationships to influence their judicial conduct or judgment. They should not lend the prestige of their office to advance the private interests of others; nor should they convey or knowingly permit others to convey the impression that they are in a special position to influence the judge.

**Canon 3. . . .**

**A. Adjudicative responsibilities. . . .**

(4) Judges . . . except as authorized by law, must not consider ex parte communications concerning a pending proceeding.

Code of Judicial Conduct (1974), Canons 2A, 2B, 3A(4).

Appellant filed an omnibus pre-trial motion, which was denied. She elected not to file a responsive pleading, however, at which point the complaint's factual allegations were deemed denied. *See* C.J.D.R.P. No. 413.

The case proceeded to trial at which the CJD heard the evidence summarized above. In regards to the 2011 call, Appellant testified that she never followed through and contacted Beloff because she "knew it was not the right thing to do." N.T., Sept. 8, 2016, at 218; *see also id.* at 170-71, 192. When asked about her statements, during the FBI interview, that judges do not call one another and that a family member in trouble would be "on their own," Appellant confirmed she gave those answers, but indicated she thought the questions pertained only to Family Court and that the term "trouble" was limited to criminal charges. *See* N.T., Sept. 8, 2016, at 185-87. As for the Board's letters of inquiry, Appellant admitted that her responses were incorrect, but she attributed that to a lapse of memory inasmuch as the letters were sent almost three years after the events in question. *See id.* at 188-90, 210. During her testimony, Appellant acknowledged on several occasions that her conduct was wrong and emphasized that her ethical failing was based solely on a desire to help her son and would never happen again. *See, e.g.*, *id.* at 192-95.

By opinion and order dated October 20, 2016, the CJD found Appellant in violation of Canons 2A and 2B and, by extension, Article V, Section 17(b) of the Constitution. The court also ruled that Appellant had transgressed Article V, Section 18(d)(1) of the Constitution by engaging in conduct which brought the judicial office into disrepute and prejudiced the proper administration of justice.

In reaching its holdings, the court took note of the Board's position that "the provision of 'favoritism' upon *ex parte* requests, for the benefit of those who are politically connected or are family members or friends of judges or other court employees, has for too long haunted our state judiciary." *In re Roca*, No. 14 JD 2015, *slip op.* at 22 (Pa. Ct. Jud. Disc. Oct. 20, 2016) (quoting N.T., Sept. 18, 2016, at 23). In terms of whether Appellant's conduct brought the judicial office into disrepute, the court

observed that the standard for such inquiry is based on the reasonable expectations of the public, which include a belief that judicial officers will not make overt, *ex parte* attempts to influence case outcomes to benefit family members. The court explained that the record was "replete with references to the intercepted phone calls between former Judge Waters and [Appellant]. These were clear, overt, and *ex parte* steps taken to influence the case in favor of Ian C. Rexach." *Id.* at 24. The court added that "disrepute 'may result where the actions took place inside or outside of court proceedings.'" *Id.* (quoting *In re Carney*, 621 Pa. 476, 494, 79 A.3d 490, 501 (2013)).

The CJD made similar underlying findings to support its conclusion that Appellant had prejudiced the proper administration of justice and violated Canons 2A and 2B. *See id.* at 24-26. However, the court found it unnecessary to reach the question of whether Appellant violated Canon 3A(4), as it viewed the asserted conduct underlying that charge as having been addressed in ruling on the other counts of the complaint. *See id.* at 26. In this regard, the court explained that, unlike in criminal matters, the full range of sanctions is available based on a single violation, and its discretion in imposing discipline is not grounded on the number of ways the same conduct offended the Constitution or the Code, but on the nature of the conduct together with any mitigating or aggravating circumstances. *See id.* at 26 (quoting *In re Eagen*, 814 A.2d 304, 306-07 (Pa. Ct. Jud. Disc. 2002)).

After Appellant waived objections and exceptions to the CJD's ruling, a sanctions hearing was held at which several character witnesses appeared on Appellant's behalf. Appellant also testified, stating that she accepted full responsibility for her actions and apologizing for her misconduct.

The CJD imposed the sanction of removing Appellant from the bench and barring her from holding judicial office in the future. *See In re Roca*, 151 A.3d 739, 740, 744

(Pa. Ct. Jud. Disc. 2016). The court reviewed the ten non-exclusive factors it routinely considers, and how those applied to the present case.[5] It then acknowledged the "honest regrets extended by" Appellant, and additionally expressed appreciation for the input provided by Appellant's character witnesses. *Id.* at 743.

The court observed, however, that "good character evidence does not undo" unethical behavior, and that the focus of a sanctions decision goes beyond the individual jurist to the "message sent to the public and the effect on the expectation of standards of behavior." *Id.* (quoting *In re Berkhimer*, 593 Pa. 366, 374, 930 A.2d 1255, 1259 (2007)). Thus, the CJD noted that the proceedings are not chiefly punitive in nature, but rather, are aimed at protecting citizens from judicial abuse and corruption. As it was clear from the record that Appellant's actions were undertaken voluntarily and with a motive to obtain special judicial treatment for her son, the court determined that she engaged in willful misconduct. The court concluded:

> It cannot be reasonably disputed that Judge Roca, at first, only requested advice from former Judge Waters, but then the conversation clearly fell into an agreement to obtain *ex parte* contacts with the judge handling her son's case. However, rather than refuse to participate in this scheme, she fully complied and willfully participated in the scheme. As we have said in more detail in prior decisions, when it comes to corrupt acts and the derogation of a fair and just judicial process, a judge must have the willingness to stand up for what [is] right and buck a corrupt tide.

*Id.* (internal quotation marks omitted).

---

[5] The factors are: (1) whether the conduct is an isolated event or part of a pattern of conduct; (2) the nature, extent, and frequency of the acts of misconduct; (3) whether the conduct occurred in or out of the courtroom; (4) whether the conduct occurred in the judge's official capacity or in her private life; (5) whether the judge has acknowledged or recognized that the acts occurred; (6) whether the judge has evidenced an effort to change or modify her conduct; (7) the judge's length of service on the bench; (8) whether there have been prior complaints about the judge; (9) the conduct's effect on the integrity of, and respect for, the judiciary; and (10) the extent to which the judge exploited her position to satisfy her personal desires. *See id.* at 742-43.

On appeal, Appellant alleges that the CJD's removal-and-bar sanction is unduly harsh under the circumstances. She requests relief in the form of a lesser penalty such as a six-month or one-year suspension. In this respect, Appellant maintains, first, that this Court is not bound by the state constitutional provision, discussed below, which limits our review of the sanction imposed by the CJD to whether it was lawful. In the alternative, Appellant proffers that the punishment was not lawful because it was inconsistent with that court's prior decisions in cases where the misconduct was not extreme.[6] These arguments are discussed below.

## II. Analysis

The mechanism for disciplining jurists, as reflected in the 1968 state charter, involved this Court acting in the first instance on the recommendations of an investigative body called the Judicial Inquiry and Review Board (the "JIRB"). *See, e.g.*, *In re Larsen*, 532 Pa. 326, 616 A.2d 529 (1992). The Constitution was materially amended in 1993. In the wake of such amendments, this Court retains supervisory and administrative authority over all of Pennsylvania's courts and justices of the peace, *see* PA. CONST. art. V, §10(a), the JIRB no longer exists, and the disciplinary apparatus is separated into distinct prosecutorial and adjudicative functions to be carried out by the Board and the CJD, respectively. *See id.* §18(a), (b). Under the new scheme, this

---

[6] This Court permitted limited oral presentations on this latter issue, which we framed for argument as follows:

> When imposing sanctions, is the Court of Judicial Discipline bound to follow the doctrine of stare decisis and thus required to follow its prior decisions when sanctioning a jurist?

*In re Angeles Roca First Judicial Dist. Phila. Cnty.*, No. 42 EAP 2016, Order (Pa. Mar. 31, 2017).

Court exercises appellate review of the CJD's final disciplinary orders. *See id.* §18(c). *See generally In re Bruno*, 627 Pa. 505, 521-23, 101 A.3d 635, 644-45 (2014) (summarizing this history).[7]  In particular, judges may appeal from an adverse final order of the CJD, *see* PA. CONST. art. V, §18(c)(1), and – although not implicated here – the Board may appeal from a final order dismissing its complaint. *See id.* §18(c)(3).

## A. Standard of review

Per the 1993 amendments, the Constitution is fairly explicit in prescribing the manner of our appellate review:

> On appeal, the Supreme Court . . . shall review the record of the proceedings of the [CJD] as follows:  on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful.  The Supreme Court . . . may revise or reject an order of the [CJD] upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court . . . shall affirm the order of the [CJD].

PA. CONST. art. V, §18(c)(2).[8]

Pursuant to the above, and in terms of our consideration of the sanction imposed, we do not substitute our concept of the appropriate penalty for that chosen by the CJD.  Rather, we ask whether the sanction is "lawful."

---

[7] An entity called a "special tribunal" performs appellate review in cases where a justice of this Court is subject to discipline.  *See* PA. CONST. art. V, §18(c)(1).

[8] The drafters used the terms scope of review and standard of review synonymously, as the phrase, "this standard of review," clearly refers back to the three prescribed scopes of review.  Although this Court has, in some contexts, stated that scope and standard refer to different aspects of appellate review, *see, e.g.*, *In re L.J.*, 622 Pa. 126, 137-38, 79 A.3d 1073, 1079-80 (2013) (motion to suppress evidence); *Morrison v. DPW, Office of Mental Health (Woodville State Hosp.)*, 538 Pa. 122, 131-33, 646 A.2d 565, 570-71 (1994) (motion for a new trial), that specific terminology has no application here in light of the constitutional text.

Appellant contends in her first issue that, after *Bruno*, we are not constrained by this constitutional text. She reasons that, in *Bruno*, this Court "amended and limited the powers set forth in Article V, Section 18," insofar as it "found that [its] King's Bench authority transcended the other powers enumerated in the Constitution and the Judicial Code." Brief for Appellant at 54. She therefore asserts that we now have "parallel jurisdiction with full rights to intervene" in a matter involving judicial discipline and, in doing so, to exercise *de novo* review. *Id.* at 55.

This is a difficult argument to maintain. It is established that "[t]he Constitution is the fundamental law of our [C]ommonwealth, and in matters relating to alterations or changes in its provisions, the courts must exercise the most rigid care to preserve to the people the right assured to them by that instrument." *Commonwealth ex rel. Schnader v. Beamish*, 309 Pa. 510, 515, 164 A. 615, 616-17 (1932). Our state charter, which comprises "the Commonwealth's organic law," *Driscoll v. Corbett*, 620 Pa. 494, 510, 69 A.3d 197, 207 (2013), may be amended "in the manner specifically set forth therein, or a new one may be put in force by a convention duly assembled, its action being subject to ratification by the people, but *these are the only ways* in which the fundamental law can be altered." *Stander v. Kelley*, 433 Pa. 406, 410-11, 250 A.2d 474, 476 (1969) (emphasis altered, internal quotation marks, citation, and footnote omitted). Further, "[n]othing short of a literal compliance with this mandate will suffice." *Pa. Prison Soc'y v. Commonwealth*, 565 Pa. 526, 538, 776 A.2d 971, 978 (2001) (internal quotation marks and citation omitted). Therefore, we differ with Appellant's evident premise, that a decision of this Court is capable of "amending" constitutional text such as the prescribed review standard as set forth in Article V, Section 18(c)(2).

Additionally, Appellant misinterprets *Bruno.* That case related to the interplay between this Court's supervisory powers over the Unified Judicial System (including its

employees) and the CJD's constitutionally-based authority – in relation to a judicial officer charged with a felony – to issue a non-appealable order suspending the jurist on an interim basis. *See* PA. CONST. art. V, §18(d)(2). The particular dispute arose when the CJD suspended Judge Bruno with pay after this Court had suspended him without pay. The conflict between the two suspension orders, in turn, raised the issue of whether, in light of the CJD's interim-suspension authority, this Court's supervisory powers still included the ability to suspend a jurist charged with a felony.

The *Bruno* Court ultimately held that, pursuant to this Court's King's Bench authority, our power of interim suspension subsists alongside that of the CJD, but it should be reserved for "extraordinary circumstances." *Bruno*, 627 Pa. at 583, 101 A.3d at 682.[9] Inasmuch as the two irreconcilable suspension orders continued in existence, the *Bruno* Court also concluded that this Court's order was "supreme and controlling" over that of the CJD. *Id.* at 516, 101 A.3d at 641 (internal quotation marks omitted).

Appellant reads *Bruno* as implying that, where the integrity of the judicial system demands it, this Court can assert its supervisory power so as to disregard the standard of review set forth in Article V, Section 18(c)(2). Such a precept cannot reasonably be derived from *Bruno*. Nothing in *Bruno* suggests that this Court's supervisory responsibilities can justify acting contrary to, overriding, or essentially re-writing the text of the Constitution. Rather, *Bruno* explained that the CJD's suspension powers, as set forth in the Constitution, are not made to be exclusive. By contrast, the Court explained,

---

[9] For example, a judge charged with a felony in relation to his actions as a jurist might continue to preside over criminal cases. *See, e.g.*, *In re Franciscus*, 471 Pa. 53, 369 A.2d 1190 (1977). If the CJD does not suspend the judge within a reasonable time, an extraordinary circumstance may arise necessitating the exercise of our supervisory powers so as to "protect[] the fairness and probity of the judicial process, and the integrity, dignity, and authority of the Unified Judicial System." *Bruno*, 627 Pa. at 586, 101 A.3d at 684.

where the Constitution gives explicit "direction[s] as to how a thing is to be done," those directions must be followed to the exclusion of all other means that may be deemed "better or more convenient." *Bruno*, 627 Pa. at 579 n.24, 101 A.3d at 680 n.24 (quoting *In re Bowman*, 225 Pa. 364, 367, 74 A. 203, 204 (1909)).

Even more to the point, in issuing its interim suspension order this Court emphasized it was not punishing the jurist or imposing disciplinary sanctions, and that the constitutionally assigned standard for this Court's review of the CJD's final order of discipline remained unaffected. *See id.* at 591, 101 A.3d at 687. *See generally Commonwealth v. Russo*, 388 Pa. 462, 471, 131 A.2d 83, 88 (1957) (affirming that this Court has "no right to disregard or . . . erode or distort any provision of the Constitution, especially where, as here, its . . . language make[s] its meaning unmistakably clear"). Therefore, our present standard of review, as prescribed by Section 18(c)(2), remains unaffected by any aspect of *Bruno*.

### B. Lawfulness and consistency with prior disciplinary decisions

The Constitution sets forth the sanctions which the CJD may impose upon a judicial officer subject to disciplinary action:

> A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for conviction of a felony; violation of section 17 of this article; misconduct in office; neglect or failure to perform the duties of office or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court.

PA. CONST. art. V, §18(d)(1); *see also id.* §18(b)(5) ("A decision of the [CJD] may order removal from office, suspension, censure or other discipline as authorized by this section and as warranted by the record.").

There is no dispute that this authorizes the CJD to remove a judge from office upon a finding that he or she committed misconduct, either by violating a canon or rule prescribed by this Court, or by conduct which, *inter alia*, brings the judicial office into disrepute or prejudices the proper administration of justice.  Nor is there any challenge to the conclusion that Appellant did, in fact, violate rules of conduct, bring the judicial office into disrepute, and prejudice the proper administration of justice:  as noted, Appellant waived objections and exceptions to the CJD's determinations in this regard.

Nevertheless, Appellant posits that the sanction of removal was not lawful in light of precedent and the facts of this case.  She relies on CJD decisions in which a lesser sanction was imposed for misconduct which she views as equivalent to (or worse than) her own.  Her argument rests on the premise that the CJD acts unlawfully when it sets a penalty which is out of proportion to those imposed in previous, similar cases.  This reasoning implicates the issue we framed, in terms of *stare decisis*, for oral argument. *See supra* note 6.  We will address the question on such terms, and – for completeness – on the terms framed by Appellant with regard to proportionality and the record.

**1.  Stare decisis**

"The doctrine of *stare decisis* maintains that for purposes of certainty and stability in the law, 'a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different.'"  *Stilp v. Commonwealth*, 588 Pa. 539, 620, 905 A.2d 918, 966-67 (2006) (quoting *Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 394, 100 A.2d 595, 598 (1953)).  In this formulation the terms "conclusion" and "in the law" are particularly meaningful because *stare decisis* relates primarily to rules or pronouncements of law.  *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 235, 117 S. Ct. 1997, 2016 (1997) ("The doctrine of *stare decisis* . . . reflects a policy judgment that 'in most matters it is more important that the applicable

rule of law be settled than that it be settled right'" (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S. Ct. 443, 447 (1932) (Brandeis, J., dissenting))); *Estate of Grossman*, 486 Pa. 460, 470, 406 A.2d 726, 731 (1979) (reciting that *stare decisis* "permits the orderly growth processes of the law to flourish" (internal quotation marks and citation omitted)); 20 AM. JUR. 2D *Courts* §129 ("For a court to apply a precedent as stare decisis, there must have been a judicial opinion on a point of law.").[10]

By contrast, the above-quoted provisions of the Pennsylvania Constitution do not reflect an intent that the discipline imposed in one case should become precedent for later cases. Instead, they give wide latitude to the CJD in arriving at the appropriate discipline upon a predicate finding that a jurist violated a canon or rule, or Section 17 or 18(d)(1) of Article V. Furthermore, while legal rules have developed to guide a sentencer's discretion when imposing a penalty in the distinct, albeit somewhat analogous, arena of criminal sentencing, *see generally Graham v. Collins*, 506 U.S. 461, 488-89, 113 S. Ct. 892, 909-10 (1993) (Thomas, J., concurring) (discussing the impact of *stare decisis* upon procedural requirements surrounding imposition of the death penalty), Appellant does not forward an argument predicated on a discretion-channeling legal principle which has been developed by the CJD or this Court. Rather,

---

[10] *See also Beaulieu v. Beaulieu*, 265 A.2d 610, 613 (Me. 1970) (explaining that failing to adhere to *stare decisis* entails a "deviation [from] earlier pronouncements of law which are unsuited to modern experience"); *State v. Waine*, 122 A.3d 294, 299 (Md. 2015) (noting that the court, in an earlier case, had applied *stare decisis* in reaching certain legal conclusions); *Otter Tail Power Co. v. Von Bank*, 8 N.W.2d 599, 607 (N.D. 1942) ("The rule of stare decisis is a rule of policy grounded on the theory that when a legal principle is accepted and established, rights may accrue under it and security and certainty require that the principle be recognized and followed . . .."); *Stranahan v. Fred Meyer, Inc.*, 11 P.3d 228, 237 (Or. 2000) (couching *stare decisis* in terms of prior decisions on "a question of law" (internal quotation marks and citation omitted)); *Horne v. Moody*, 146 S.W.2d 505, 509 (Tex. Ct. Civ. App. 1940) (expounding that *stare decisis* is a doctrine "based upon the statement of a principle, rule or proposition of law").

she, in effect, urges this Court to adopt such a rule based on an asserted requirement of proportionality in relation to prior sanctions imposed by the CJD.

## 2. Proportionality in light of prior cases

The concept that the penalty decided upon by the CJD should be subject to a proportionality requirement is not without some appeal. In some jurisdictions where, as with the pre-1993 JIRB-based framework, the commission makes a recommendation to be acted on *de novo* by the state supreme court, that court expressly takes precedent into account. *See, e.g.*, *Comm'n on Judicial Performance v. Boone*, 60 So. 3d 172, 185 (Miss. 2011) (reciting that the appropriateness of the sanction recommended by the judicial performance commission is assessed with reference to six factors, including whether there is any case law on point).

The difficulty for Appellant is that no such mandate is contained, or even suggested, in Article V, Sections 18(c)(2) and 18(d)(1). For us to forge a path along the lines suggested by Appellant, we would have to overlay upon those provisions a comparative-sanctions regime that cannot fairly be gleaned from their text.[11] We would additionally do violence to the clear implication, arising from the 1993 amendments, that this Court's review of the ultimate sanction imposed by the CJD is highly restricted. As explained, our review is only for lawfulness. *Compare In re Merlo*, 619 Pa. 1, 24, 58 A.3d 1, 15 (2012) (observing that Article V, Section 18 "sets forth removal as an available sanction for bringing disrepute upon the judicial office"), *with In re Melograne*,

---

[11] Appellant's brief does not include a claim that the application of this aspect of our state charter is limited by any provision of the United States Constitution. For its part, the dissent suggests that our explanation of the appropriate standard of appellate review "is patently violative of the United States Constitution." Dissenting Opinion, *slip op.* at 26. However, to be lawful, the sanction issued by the CJD clearly must comport with the federal Constitution. As noted, there simply are no such issues raised in this appeal.

571 Pa. 490, 499, 812 A.2d 1164, 1169 (2002) (holding that the CJD's disbarring of a former judge from the practice of law was unlawful because this Court has exclusive disbarment authority). *See generally Berkhimer*, 593 Pa. at 374-75, 930 A.2d at 1259 (noting that this Court reviews sanctions for lawfulness and does not re-weigh the penalty against aggravating and mitigating circumstances).

In light of this constricted review and the lack of constitutional language tending to limit or guide the CJD in arriving at the appropriate discipline, the CJD has wide discretion to fashion the appropriate penalty once it finds a predicate violation. *See, e.g., Merlo,* 619 Pa. at 24, 58 A.3d at 15 (rejecting an argument similar to Appellant's, namely, that the sanctions imposed were "unlawful because they are greater than those imposed in other cases"). Moreover, this Court has clarified that "[s]imilarity of misconduct does not require identicality of sanction, for there are other factors that bear on that decision, including mitigating and aggravating considerations and how a particular jurist's misconduct undermines public confidence in the judiciary." *Id.* at 24, 58 A.3d at 14-15 (quoting *In re Lokuta*, 608 Pa. 223, 262, 11 A.3d 427, 450 (2011)).[12]

We acknowledge Appellant's belief that it appears unfair for her to be removed from office when earlier instances of judicial corruption, which she views as similar, were met with a lesser penalty. However, it is difficult to draw an equivalence among distinct cases of judicial misconduct, as the factors involved in each instance will naturally vary. The Wisconsin Supreme Court has elaborated on this point:

> Past judicial misconduct cases . . . are of limited usefulness in setting the sanction appropriate for this case, which involves unique circumstances. We have not established, nor will we here, a "bright line" standard when,

---

[12] Under Section 18(b)(5), the sanction must be "warranted by the record." PA. CONST. art. V, §18(b)(5). Notably, that provision focuses on the record of the case at hand, and not the discipline meted out in earlier cases involving different judges. The interplay between Section 18(b)(5) and our review for lawfulness is addressed below.

> for example, reprimand or censure is warranted as opposed to suspension. Each case is different, and is considered on the basis of its own facts.

*In re Crawford*, 629 N.W.2d 1, 11 (Wis. 2001); *accord Broadman v. Comm'n on Judicial Performance*, 959 P.2d 715, 734 (Cal. 1998) ("Proportionality review based on discipline imposed in other cases . . . is neither required nor determinative. The factual variations from case to case are simply too great to permit a meaningful comparison in many instances."). *See generally* Cynthia Gray, *A Study of State Judicial Discipline Sanctions* 81-82 (Am. Judicature Soc'y 2002) (enumerating 39 factors which courts have identified as relevant to the selection of an appropriate sanction, divided into the following categories: the nature of the misconduct; the extent of the misconduct; the judge's culpability; the judge's conduct in response to the initiation of disciplinary proceedings; and the judge's record).

It follows from the discretionary nature of the CJD's discipline determination that some degree of variance is inevitable. The CJD will always be guided by its institutional obligation to protect citizens from improper judicial behavior, deter future judicial misconduct, protect the integrity of the Commonwealth's judicial system, and re-establish the probity of, and public trust in, the court affected by the misconduct in question. This Court has repeatedly stated that imposition of discipline "not only punishes the wrongdoer, but also repairs the damaged public trust and provides guidance to other members of the judiciary regarding their conduct." *Berkhimer*, 593 Pa. at 375, 930 A.2d at 1260 (internal quotation marks and citation omitted).

As well, a judge who commits misconduct after other judges have been sanctioned for similar misconduct has the benefit of the CJD's earlier decisions. As a result, "it is not unreasonable for the second, third, or fourth judge who commits a particular type of misconduct to receive a more severe sanction than the first judge who did so." Gray, *A Study of State Judicial Discipline Sanctions* 66; *see also id.* at 66-67

(documenting a trend by the Mississippi Supreme Court of increasingly severe discipline for ticket fixing, culminating in the removal of a jurist after the court's "prior attempts to send a strong message to judges concerning ticket-fixing had 'fallen on deaf ears'" (quoting *Comm'n on Judicial Performance v. Chinn*, 611 So. 2d 849, 857 (Miss. 1992))); *accord In re Waddick*, 605 N.W.2d 861, 866 (Wis. 2000) (*per curiam*) (indicating that a harsher sanction was appropriate than in a prior case involving similar misconduct, in part, because the judge had the benefit of the court's prior decision "to appreciate how seriously the court views" that type of misconduct). Therefore, the CJD's view of the appropriate sanction for a particular type of misconduct may be adjusted as time and experience help to shape that tribunal's understanding of the measures which are necessary to achieve its institutional purposes as delineated above.

Thus, while the CJD is certainly capable of consulting prior decisions as a guide to the proper discipline for a given jurist, neither the Pennsylvania Constitution nor any other legal authority which has been brought to our attention requires it to impose sanctions which are proportional to the punishment meted out in earlier cases involving similar misconduct.

### C. Lawfulness in light of the record

Appellant also argues that removal is "extremely harsh" and "unwarranted under the facts of this case." Brief for Appellant at 50, 58. Although she does not reference Article V, Section 18(b)(5) as such, her contention implicates that paragraph's indication that the CJD may "order removal from office, suspension, censure, or other discipline as authorized by this section *and as warranted by the record*." PA. CONST. art. V, §18(b)(5) (emphasis added). Because the CJD may lawfully impose discipline warranted by the record, the unavoidable corollary is that a sanction which is *not* warranted by the record is not lawful and, as such, may be disapproved by this Court.

We view this as a limitation on the concept that we must so limit our review that the only question we address, in terms of the sanction, is whether it falls into a category which is theoretically "available" to the CJD. *See, e.g.*, *Berkhimer*, 593 Pa. at 375, 930 A.2d at 1260 (indicating that removal was a lawful sanction because the Constitution "sets forth removal as an available sanction for bringing disrepute upon the judicial office"). The "available" litmus, standing alone, would be very broad, particularly in view of the open-ended categorization of the forms of discipline that the CJD may mete out. *See* PA. CONST. art. V, §18(d)(1) (stating that a jurist who commits misconduct may be suspended, removed from office, "or otherwise disciplined"); *id.* §18(b)(5) (containing similar language couched in terms of any "other discipline" authorized by Section 18). Hence, under the warranted-by-the-record prerequisite, this Court is able to perform a final check in cases of an infraction met with an unreasonably harsh penalty completely out of proportion to the misconduct involved.

With the above principles in mind – and regardless of whether we would have removed Appellant from office if we were deciding on the appropriate sanction in the first instance – we ultimately reject Appellant's contention that her removal from office was unwarranted by the record in this case. As the CJD pointed out, although Appellant at first only sought procedural advice from Waters, via *ex parte* communications she eventually solicited and accepted the assistance of both Waters and Segal to obtain special consideration for her son's court case – consideration which other litigants would not have had available. In the context of this controversy it is uncontested that Appellant's actions prejudiced the proper administration of justice and brought the judicial office into disrepute. Against such backdrop it was not unreasonable for the CJD to conclude that Appellant's removal from the bench was an appropriate sanction in light of all of the facts of the case.

**D. The dissent's common law argument**

Notwithstanding the above, Justice Donohue, in dissent, would read into the constitutional text a requirement of proportionality as between sanctions imposed in distinct, unrelated cases. To bring such requirement within our standard of review, the dissent suggests discipline imposed by the CJD that is not proportional to that imposed in other, similar cases is unlawful. *See* Dissenting Opinion, *slip op.* at 11. This view is grounded on the premise that, as a common law matter, comparative proportionality is required, and the dissent goes so far as to claim that we are "abrogat[ing] a foundational precept of our common law system of jurisprudence." *Id.* at 1.

We respectfully differ with the dissent's premise. To provide context, we consider how the law has developed within the context of one of the most prominent punitive regimes: criminal sentencing. In that arena, a distinction has been drawn between *comparative* proportionality review and *inherent* proportionality review. *See, e.g.*, *Commonwealth v. Gribble*, 550 A.2d 62, 86-87, 703 A.2d 426, 438 (1997), *abrogated on other grounds, Commonwealth v. Burke*, 566 Pa. 402, 412-13, 781 A.2d 1136, 1142 (2001). Under comparative review, an appellate court "asks whether the punishment for a specific crime is applied consistently in similar cases[.]" *Id.* Comparative review is not required by the Constitution. *See Pulley v. Harris*, 465 U.S. 37, 53, 104 S. Ct. 871, 881 (1984).[13]

---

[13] Such comparative proportionality review that does exist in other jurisdictions is largely limited to the capital sentencing context and is often (though not always) imposed by statute. *See State v. Cobb*, 663 A.2d 948, 958 n.18 (Conn. 1995) (surveying jurisdictions). In Pennsylvania, proportionality review of death sentences was, for several years, statutorily mandated. *See* 42 Pa.C.S. §9711(h)(3)(iii) (repealed). However, persons sentenced after the repeal were not entitled to proportionality review. *See Commonwealth v. Fears*, 624 Pa. 446, 491-92, 86 A.3d 795, 822-23 (2014).

Inherent proportionality review, by contrast, asks whether the punishment is grossly disproportionate to the crime and, as such, violates the Eighth Amendment's prohibition of cruel and unusual punishment. *See Pulley*, 465 U.S. at 41-42, 104 S. Ct. at 975; *Thompson v. Parker*, 867 F.3d 641, 653 (6th Cir. 2017) (describing inherent-proportionality review as "comparing the severity of the sentence to the gravity of the crime").[14] Hence, while there is a constitutional basis for inherent proportionality review – including a "narrow proportionality principle" for non-capital sentences, *Ewing v. California*, 538 U.S. 11, 20, 123 S. Ct. 1179, 1185 (2003) (plurality) (internal quotation marks and citation omitted) – "there is no *constitutional* entitlement to any comparative-proportionality review." *Thompson*, 867 F.3d at 653 (emphasis added); *cf. State v. Lazada*, 667 N.E.2d 1292, 1294 (Ohio Ct. App. 1995) (observing that, absent gross disproportionality between the crime and sentence, "a comparison with other sentences need not be performed" (citing *Harmelin v. Michigan*, 501 U.S. 957, 1005, 111 S. Ct. 2680, 2707 (1991) (plurality in relevant part))). *See generally Alleyne v. United States*, 570 U.S. 99, ___, 133 S. Ct. 2151, 2163 (2013) (recognizing that "broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment").

As a comparative-review regime is not imposed by constitutional or statutory law, the question is whether it is required by common law, as the dissent posits. The dissent articulates that Pennsylvania has a "common law tradition," and that the CJD has a "place within our common law system." Dissenting Opinion, *slip op.* at 11. The dissent concludes from these two predicates that "the CJD must follow its own precedent in fashioning and imposing sanctions, and we must review the sanctions it imposes in the same light." *Id.* It is notable, though, that the dissent does not reference any authority

---

[14] While the Eighth Amendment is the federal constitutional basis for inherent proportionality review, in relation to judicial discipline in Pennsylvania, such review is mandated by in the warranted-by-the-record prerequisite, as developed above.

to support its essential thesis that, *as a matter of common law*, comparative proportionality relative to unrelated cases limits the CJD's discretion in imposing judicial discipline – or, for that matter, limits a sentencer's discretion in imposing criminal punishment. *See generally People v. Fern*, 723 N.E.2d 207, 210-11 (Ill. 1999) (affirming that there is no common law requirement of comparative-proportionality in regard to criminal sentencing); *People v. Welsh*, 425 N.E.2d 53, 54 (Ill. Ct. App. 1993) (explaining that "one sentence is no precedent for another"). Further, although we have explained that *stare decisis* pertains to legal holdings and not individual sentences imposed in distinct cases, the dissent fails to account for this distinction.

In light of the above, we disagree with the dissent's effort to transform the doctrine of *stare decisis* into a requirement of comparative-proportionality review in regard to judicial discipline. We recognize that inherent proportionality review is appropriate to allow for the disapproval of a sanction grossly disproportionate to the underlying conduct. However, as in criminal sentencing – where liberty is at stake – there is nothing in our decisional law suggesting courts must undertake an analysis of distinct cases with inevitably different underlying facts to impose a vague "*stare decisis*" overlay onto the CJD's discretionary decisions. As we have explained, the framework for limited and deferential appellate review of the CJD's discretionary decisions is set forth in the state charter and embedded in this Court's precedent. That framework does not require comparative proportionality on the CJD's part, or review for the same by this Court.[15]

---

[15] Although comparative proportionality review is not constitutionally required, nothing in this opinion should be construed as prohibiting the CJD from undertaking such review if, in its discretion, it chooses to do so when imposing discipline.

## E. The concurrence's objections

In her Concurring and Dissenting Opinion, Justice Todd criticizes us for allowing for such final-check review under the lawfulness inquiry, labeling it as "expansive" and expressing that it could lead to this Court "routinely weighing in on the appropriateness of the sanction imposed by the CJD and substituting its judgment for that of the CJD[.]" Concurring and Dissenting Opinion *slip op.* at 3. Thus, we repeat what we have already emphasized: (a) this Court does *not* substitute its concept of the appropriate penalty for that chosen by the CJD; and (b) an unwarranted-by-the-record penalty is limited to one which is completely out of proportion to the underlying misconduct.

To the extent the concurrence indicates that the warranted-by-the-record mandate is solely directed at the CJD and does not pertain to the proper scope of this Court's review, *see id* at 2-3, we note that any discipline imposed by the CJD which fails to comport with its own constitutional limitations is necessarily unlawful.

Separately, the concurrence asserts that it is inappropriate for us to assess the meaning of the constitutional phrase, "warranted by the record," absent the issue having been expressly raised and discussed by the parties. *See id.* at 1-2. As Justice Todd acknowledges, however, Appellant states in her proportionality argument that her discipline is overly harsh and unwarranted by the underlying facts (*i.e.*, the record). This subsumes a claim of "inherent disproportionality," as discussed above. As Appellant has raised the issue, we cannot avoid determining whether she is presently entitled to appellate relief on that basis. To reach such a determination, however, we must initially discern the scope of our appellate jurisdiction as set forth in the Constitution so as to ascertain whether it permits us to consider such a claim on the merits.[16]

---

[16] The concurrence suggests our discussion of the scope of appellate jurisdiction is *dicta* if Appellant has, in fact, raised an inherent-disproportionality claim. *See id.* at 3-4. (continued…)

Notably, we are an appellate court and, as such, the scope of our appellate jurisdiction is cabined by the constitutional text. *See generally* PA. CONST. art V, §2(c) (stating that this Court has such jurisdiction as is "provided by law"). Ascertaining boundaries on appellate jurisdiction is a task which appellate courts routinely undertake *sua sponte*. *See Commonwealth v. Saunders*, 483 Pa. 29, 32 n.2, 394 A.2d 522, 524 n.2 (1978); *see also Commonwealth v. Beasley*, 559 Pa. 604, 608, 741 A.2d 1258, 1261 (1999); *accord, e.g.*, *Spiegel v. Trustees of Tufts Coll.*, 843 F.2d 38, 43 (1st Cir. 1988) (considering the propriety of a federal Rule 54(b) certification *sua sponte* because "the issue implicates the scope of our appellate jurisdiction"); *Braswell Shipyards, Inc. v. Beazer East, Inc.*, 2 F.3d 1331, 1336 (4th Cir. 1993) (same); *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997) (same); *Province v. Province*, 473 S.E.2d 894, 899 n.11 (W. Va. 1996) ("We are duty bound to take up the jurisdictional issue *sua sponte*, because it implicates the scope of our appellate jurisdiction.").

By way of rejoinder, the concurrence draws a distinction between jurisdiction and authority and asserts that this case concerns only the latter. *See* Concurring and Dissenting Opinion, *slip op.* at 4. We respectfully disagree for the reasons mentioned above, most notably, that we are concerned with whether the merits of *any* inherent-disproportionality argument are cognizable within our appellate function in judicial discipline matters – a jurisdictional question.[17] Moreover, our determination in this

---

(…continued)
In this respect, the concurrence conflates the distinct questions of whether a substantive claim has been raised, and whether this Court can reach its merits.

[17] We observe, as well, that jurisdictional questions may involve issues that go beyond whether the controversy at hand falls into a general category. *Beasley*, for example, pertained to a series of post-conviction claims. *See Beasley*, 559 Pa. at 607, 741 A.2d at 1260. The post-conviction court obviously had jurisdiction over the *subject matter*, or
(continued…)

regard is consistent with a wide range of decisions recognizing that courts of limited jurisdiction – including appellate courts subject to jurisdictional constraints – should always act within the scope of their jurisdiction. *See, e.g.*, *Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007); *cf. Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S. Ct. 2396, 2403 (1978) ("The limits

---

(…continued)
the "general class to which the case presented for consideration belong[ed]," Concurring and Dissenting Opinion, *slip op.* at 4 (citation omitted) – namely, petitions for relief filed under the PCRA. *See* 42 Pa.C.S. §§9543(a), 9545(a). This Court, however, acted *sua sponte* to invoke an express statutory time limitation that served as jurisdictional constraint extrinsic to the underlying subject matter. *See Beasley*, 559 Pa. at 608-09, 741 A.2d at 1261; *see also Reading Anthracite Co. v. Rich*, 525 Pa. 118, 130, 577 A.2d 881, 886 (1990) (noting that an appeal period impacts upon an appellate court's "jurisdiction to hear and decide a controversy"); *accord United States v. Brown*, 108 F.3d 1370, 1997 WL 138864, at *1 (2d Cir. Mar. 18, 1997) (indicating that the timeliness of a defendant's notice of appeal implicated the appellate court's "jurisdictional authority" and thus could be raised *sua sponte*).

The concurrence dismisses the import of these cases and implies that application of jurisdictional limitations leads to either "further review by the court, or dismissal" of the appeal. Concurring and Dissenting Opinion, *slip op.* at 4. Such a clean dichotomy does not always obtain, however. For instance, we are precluded by statute from reviewing discretionary aspects of a criminal sentence, *see* 4 Pa.C.S. §9781(f) – a limitation this Court has recognized as jurisdictional. *See, e.g.*, *Commonwealth v. Shiffler*, 583 Pa. 478, 484, 879 A.2d 185, 188-89 (2005). In the context of such a challenge, the appeal need not be dismissed entirely, as we retain limited appellate jurisdiction to evaluate whether the Superior Court correctly applied relevant legal principles in its resolution of a challenge to the discretionary aspects, *see Commonwealth v. Smith*, 543 Pa. 566, 570, 673 A.2d 893, 895 (1996); *Commonwealth v. Mouzon*, 571 Pa. 419, 427, 812 A.2d 617, 622 (2002) (plurality), and whether the sentence is illegal. *See Commonwealth v. Bradley*, 575 Pa. 141, 148-49, 834 A.2d 1127, 1131 (2003). Thus, where both discretionary aspects and legal challenges are raised, this Court reviews one but not the other, *see Commonwealth v. Walls*, 592 Pa. 557, 575, 926 A.2d 957, 968 (2007) (considering matters of law associated with a challenge to discretionary aspects, but remanding to the Superior Court to reassess its discretionary ruling in light of this Court's lack of jurisdiction to do so), because, as noted, the scope of our appellate jurisdiction includes one but not the other.

upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded."). Short of invoking the King's Bench power in extraordinary circumstances, *see In re Bruno*, 627 Pa. 505, 101 A.3d 635 (2014), this Court serves as a court of limited jurisdiction in review of judicial discipline imposed by the constitutionally-authorized tribunal, *i.e.*, the CJD. We thus deem it necessary and appropriate to consider the constitutional boundaries of our own limited appellate jurisdiction relative to Appellant's inherent-disproportionality argument.

### III. Conclusion

For the reasons given, the penalty imposed by the CJD was lawful. That being the case, we lack authority to overturn it.

Accordingly, the order of the Court of Judicial Discipline is affirmed.


Justices Baer, Wecht and Mundy join the opinion.

Justice Baer files a concurring opinion.

Justice Todd files a concurring and dissenting opinion.

Justice Donohue files a dissenting opinion.

Justice Dougherty did not participate in the consideration or decision of this case.